## NATHANIEL HEMPSTEAD *against* JARED STARR.

*A.* on the eve of a failure, made a general assignment of his effects, and gave immediate possession, to *B.* one of his creditors, in trust to satisfy the debts due to *B.* and certain other meritorious creditors specified, and to pay over the surplus, if there should be any, to the creditors generally. *C* and *D* creditors not specially named, soon afterwards attached those effects in the hands of *B.* as the property of *A.* Held, that this conveyance was not by law fraudulent against the attachment of creditors.

MOTION for a new trial.

This was an action of trover, for certain goods, wares, and merchandise, specified in the declaration.

The defendant pleaded the general issue.

On the trial, it appeared, that the plaintiff was an officer, and had taken the goods in question as the property of *Francis Hazard*, by virtue of three attachments against him. The defendant claimed them as his property, by virtue of the following bill of sale from *Hazard:* " Know all men by these presents, that I, *Francis Hazard*, of the town of *New-London*, in the county of *New-London*, and state of *Connecticut*, for the consideration of one thousand dollars, received to my full satisfaction of *Jared Starr*, of said town of *New-London*, have sold, transferred, bargained, assigned, and conveyed to the said *Jared Starr*, his heirs and assigns for ever, and by these presents do bargain, sell, transfer, assign and convey to the said *Jared Starr*, and his heirs and assigns for ever, all the dry goods, groceries, hardware, crockery ware, and wet goods now in my store or stores in *New-London*, a schedule or inventory whereof is hereunto annexed,(*a*) for him the said *Jared Starr* to have and to hold the same to his and his heirs' own proper use and behoof for ever. And I hereby covenant to and with the said *Jared Starr*, that I have good right to bargain and sell the same, and bind myself and my heirs for ever, to warrant and defend the above bargained property and goods to

(*a*) There was a particular inventory of the several articles appended to the bill of sale, which it is unnecessary to insert here.

him the said *Jared Starr*, his heirs and assigns for ever.
Always provided, and these presents are upon condition,
that whereas *Jared Starr, Daniel Douglass, Josiah Doug-
lass, Reuben Langdon, Stephen Holt, Henry Truman,* and
*Charles Hazard,* all of said *New-London,* have severally,
at my instance and request, endorsed my notes of hand,
and are liable to pay money on my account, the said
*Jared Starr* for about the sum of two thousand dollars,
the said *Daniel Douglass* for about the sum of fifteen
hundred dollars, the said *Josiah Douglass* for about the
sum of six hundred dollars, the said *Reuben Langdon*
for about the sum of three hundred dollars, the said
*Stephen Holt* for about the sum of one hundred
and fifty dollars, the said *Henry Truman* for about the
sum of fifteen hundred dollars, and the said *Charles
Hazard* for about the sum of two thousand dollars. And
whereas also I am justly indebted to *Ebenezer Learned,*
of said *New-London,* in the sum of one hundred and fifty
dollars, or thereabouts, for money lent, and also to Mrs.
*Jane Stewart,* of said *New-London,* for money lent to the
amount of one hundred and fifty dollars, or thereabouts,
and to *Jeremiah F. Jenkins,* of *Providence,* for goods
sold for him on commission, for about the sum of three
hundred dollars, and also to *Amos Cross,* of *Westerly,*
for money which I have borrowed of him to the amount
of three hundred dollars, or thereabouts. Now, if I well
and truly pay each of said notes, and save the endorsors
thereon, and every of them harmless from the payment
of any money on said notes, which they may endorse to
continue and run said old notes, and also well and truly pay
to each of said persons to whom I am indebted for bor-
rowed money, and for goods sold on commission, such
sums as I respectively owe them, then the above and
foregoing instrument to be void; otherwise, to be and
remain in full force, power and virtue. It being, how-
ever, always understood, and it is my intention therein,
that the residue or surplus of property, if any, after pay-

ing and discharging the above-mentioned debts to endorsors, and those who have lent me money, shall be for the use and benefit of all my creditors generally. In witness whereof, I have hereunto set my hand and seal, this 5th day of *March*, 1808.

" *Francis Hazard.*"

This bill of sale was executed at the time it bears date, on the eve of *Hazard's* failure; and the goods specified therein were actually delivered to the defendant, and deposited in his store, before the morning of the next day, and before the service of the attachments by the officer. Mr. *Cleaveland*, the attorney for the creditors, named as plaintiffs in the attachments, then went to the defendant's store, and informed him of their several demands, and that he should direct the officer to seize those goods as the property of *Hazard*. After this, in the forenoon of the same day, *Hazard* drew orders on the defendant, in favour of most, or all those creditors, who were named in the bill of sale, which were immediately accepted by the defendant conditionally " to be paid as far as said goods should avail on the sale thereof." In the afternoon, the attachments were levied; but the goods were not removed from the defendant's store. It was admitted, that the creditors named in the bill of sale, and in the attachments, were *bonâ fide* creditors. The goods were sold by the defendant. On those facts, the court, in their charge to the jury, instructed them, that if a debtor, on the eve of a failure, make a bill of sale, or conveyance of his effects to one of his creditors, therein directing him to convert the same into money, and pay himself and certain other favourite creditors therein named, with this condition annexed, that if any surplus should be left, after discharging the debts due to such favourite creditors, it should be applied to the discharge of his debts

due to his creditors generally, such bill of sale or convey-
ance, is by law fraudulent, and invalid, against the legal
attachments of creditors. They, therefore, directed the
jury to find a verdict for the plaintiff; which was ac-
cordingly done.

The defendant excepted to this direction of the court
to the jury; and thereupon moved for a new trial, which
motion was reserved for the consideration of the nine
judges.

*Goddard* and *Law*, in support of the motion.

1. There ought, at any rate, to be a new trial; because
the case should have been left to the jury as a question
of *fact*. The court should not have directed the jury
positively, that this assignment was fraudulent in law;
but should have submitted it to them to say whether it
was fraudulent in fact. In *Estwick* v. *Caillard*, 5 *Term
Rep.* 420. *Grose*, J. at the trial, left it to the jury to
consider, whether a fraudulent transaction was proved;
and the whole court sanctioned this direction, by refu-
sing to set aside a verdict in pursuance of it. The
ground they proceeded upon was, that there were no
extrinsic circumstances to show that any fraud was in-
tended. But if it was a mere question of law whether
the conveyance was fraudulent, why should inquiry be
made respecting *extrinsic circumstances*, and an *inten-
tion of fraud ?* So, in *Ingliss et al.* v. *Grant*, 5 *Term Rep.*
530. Lord *Kenyon* stated, as the ground of the decision
of the court, that the transaction was perfectly fair at
the time, and without any fraudulent intention, and that
the grantor acted honestly in executing the deeds.
These are circumstances proper for the jury to consider,
and decide upon.

2. But admitting that it was competent for the court to direct the jury peremptorily on the question of fraud, we contend that the direction given was incorrect. Here we are relieved from most of the circumstances relied upon, in other cases, as badges of fraud. The property was actually delivered; the creditors were not only *bonâ fide*, but *meritorious* creditors; they were lenders of money, endorsors, and those who had intrusted goods to sell on commission. The only questions. which can arise, are, whether a debtor may, in this state, give a preference to any of his creditors; and whether a transfer to a trustee for certain creditors, is valid.

It is the policy of our law to give a preference to the vigilant creditor. If a debtor will not voluntarily give up his property to satisfy a debt when demanded, the law will compel him to do it, by attachment. What is done voluntarily by the party, ought to avail as much as what is done compulsorily by attachment. That the preference in this case was given on the eve of a failure can make no difference; for we have no statutes of bankruptcy, nor does the common law recognise the principles of such statutes. [SWIFT, J. said he considered it as settled, that a debtor may prefer his creditors; and the counsel did not pursue the argument on that point.]

No reason can be given why an assignment to trustees for the benefit of creditors should not be as valid as to the creditors themselves, except that the assent of the creditors is wanting, or that the assignor retains some control over the property.

As to the first of these, it is sufficient to observe, that the assent of the creditors will be presumed until their dissent be shown. In *The Countess of Gainsborough* v. *Gifford*, 2 *P. Wms.* 424. 430. the assignee did not know of the assignment; but this was held to be no objection

to its validity. *Atkin v. Barwick*, 1 *Stra.* 165. is to the same effect. The *Chief Justice* said, that in such case, the contract does not stand open till agreement, but is complete, unless there is an actual disagreement. But from the statement of the principal case, it appears, that there was an actual assent of the creditors, as they took orders in their favour, drawn by *Hazard* on the defendant.

In the next place, what control had *Hazard* over this property, after making the assignment? We answer confidently, none at all. No part of it was ever to revert to him, or be subject to his direction. By the terms of the deed of assignment, it was to be applied, in the first place, to the payment of the claims of certain creditors therein named, and then, if there should be a surplus, it was to go to the creditors generally. The defendant had a perfect right to sell it, or control it at pleasure, until his own debt, and the debts of the other creditors, were paid.

*Cleaveland* and *Gurley*, contra, relied principally upon this ground: That *Hazard* made a general conveyance of his effects for the benefit of *all his creditors*, and that some of those creditors *dissented*, and attached. The conveyance, of course, could not be valid with respect to any. In the cases cited by the counsel for the defendant, all the creditors assented, (or it was so presumed,) and claimed the benefit of the assignment.

They also contended, that this general conveyance, upon the eve of a failure, was a fraud upon the attachment law of this state. Where the object is to evade that law, the act is void, just as it would be in *England*, if it operated as a fraud upon the bankrupt law. *Brown's Executors v. Burrell*, 1 *Root*, 252. and *Hovey v. Clark*, *ibid*. were cited. [SWIFT, J. said, the case of *Hovey v.*

VOL. III.  Y Y

June, 1809.

HALSEY
v.
BROWN.

*Clark* was incorrectly reported: No sort of inference ought to be drawn from it.]

BY THE COURT. The bill of sale is not on the face of it fraudulent, although the whole transaction may have been a fraud as against creditors.

The facts disclosed on the motion do not warrant the decision of the court, that the bill of sale and conveyance was by law fraudulent against the attachment of creditors, nor the charge to the jury on that point.

New trial to be granted.