168 P.3d 1265 (2007)
STATE of Washington, Respondent,
v.
Charlie Bernnett DAY, Petitioner.
No. 78187-7.
Supreme Court of Washington, En Banc.
Argued January 23, 2007.
Decided October 11, 2007.
*1266 Dennis W. Morgan, Attorney at Law, Ritzville, WA, for Petitioner.
Office of Benton County Prosecuting Attorney, Attorney at Law, Angelica J. McGaha, Attorney at Law, Kennewick, WA, for Respondent.
CHAMBERS, J.
¶ 1 Benton County Sheriff's Deputy Jeff Hayter was driving on patrol one Sunday morning. The deputy saw a car backed into shrubbery along the Yakima River in an "improved access facility," where parked vehicles are supposed to display parking permits.[1] RCW 77.32.380. Deputy Hayter *1267 testified he approached the car to check whether there was a permit. As Deputy Hayter approached, he saw Charlie Day sitting in the car with his head moving as if he was looking for something. As Deputy Hayter got closer, he started to suspect the car were associated with drug use because it was cluttered with cigarette lighters and rubber gloves, among other things. Of immediate interest to Deputy Hayter, however, was an empty handgun case on the floor near Day's feet.
¶ 2 Deputy Hayter asked Day if there was a gun in the car. Day said there was. Day was cooperative but Deputy Hayter (he later testified) nonetheless became concerned for his safety and asked Day to step out of the car. Day did. Deputy Hayter frisked Day, handcuffed him, and asked where the gun was. Day said it was behind the passenger seat where his wife was sitting. Deputy Hayter then asked Alice Day[2] to exit the vehicle and frisked her as well, while telling both Days they were not under arrest. After another officer arrived, Deputy Hayter searched the car and found the handgun under the passenger seat.
¶ 3 Dispatch reported the gun was stolen and there was an outstanding arrest warrant for Alice Day. Deputy Hayter arrested the couple, conducted a search incident to arrest, and discovered evidence of methamphetamine manufacturing in the vehicle. Based on that evidence, Day was charged and convicted of manufacturing methamphetamine.
¶ 4 Day argues that the officer exceeded his authority under the Washington State Constitution by stopping and searching him merely on suspicion of a parking infraction and, therefore, that the fruits of that search must be suppressed and his conviction vacated for lack of lawful evidence. Whether the officer acted with authority of law turns on whether the Terry[3] exception to the warrant requirement, which allows an officer to stop and frisk a person without a warrant or probable cause under certain limited circumstances, applies to these circumstances. The Court of Appeals found it did and affirmed Day's conviction. State v. Day, 130 Wash. App. 622, 627, 124 P.3d 335 (2005). We granted Day's petition for review, State v. Day, 158 Wash.2d 1009, 143 P.3d 830 (2006), and reverse.

ANALYSIS
¶ 5 The trial court denied Day's motion to suppress evidence seized in the search. We review the trial court's conclusions of law de novo. State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999) (citing State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996)).
¶ 6 The right to be free from searches by government agents is deeply rooted into our nation's history and law, and it is enshrined in our state and national constitutions. The United States Constitution prohibits unreasonable searches and seizures; our state constitution goes further and requires actual authority of law before the State may disturb the individual's private affairs. U.S. CONST. amend. IV; CONST. art. I, § 7; see also State v. Evans, 159 Wash.2d 402, 150 P.3d 105 (2007); State v. Boland, 115 Wash.2d 571, 577-78, 800 P.2d 1112 (1990); State v. Myrick, 102 Wash.2d 506, 510, 688 P.2d 151 (1984). Generally, officers of the State must obtain a warrant before intruding into the private affairs of others, and we presume that warrantless searches violate both constitutions. That presumption can be rebutted if the State shows a search fell within certain "narrowly and jealousy drawn exceptions to the warrant requirement." State v. Stroud, 106 Wash.2d 144, 147, 720 P.2d 436 (1986); see also State v. Duncan, 146 Wash.2d 166, 171-72, 43 P.3d 513 (2002) (citing State v. Williams, 102 Wash.2d 733, 736, 689 P.2d 1065 (1984)).
¶ 7 Our state constitution goes beyond the Fourth Amendment's prohibition on *1268 "unreasonable" searches and seizures. However, reasonableness does have a role to play in defining the constitutional term "private affairs" in article I, section 7. We do not exclude evidence that was in open or plain view. State v. Kull, 155 Wash.2d 80, 85, 118 P.3d 307 (2005). Consent and certain exigent circumstances may also justify a warrantless search and seizure. Charles W. Johnson, Survey of Washington Search and Seizure Law: 2005 Update, 28 Seattle U.L.Rev. 467, 633, 650 (2005); see also State v. Hendrickson, 129 Wash.2d 61, 71, 917 P.2d 563 (1996).
¶ 8 But we jealously guard these exceptions lest they swallow what our constitution enshrines. Cf. State v. O'Neill, 148 Wash.2d 564, 584-85, 62 P.3d 489 (2003) (citing Wayne A. Logan, An Exception Swallows a Rule: Police Authority to Search Incident to Arrest, 19 YALE L. & POL'Y REV. 381 (2001) (comparing Washington's narrower search incident to arrest exception to its federal counterpart)). See also Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (quoting Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)). If the evidence was seized without authority of law, it is not admissible in court. We suppress such evidence not to punish the police, who may easily have erred innocently. We suppress unlawfully seized evidence because we do not want to become knowingly complicit in an unconstitutional exercise of power. See generally Olmstead v. United States, 277 U.S. 438, 484-85, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).[4]
¶ 9 The State asks us to extend one of our carefully drawn exceptions to the warrant requirement to parking infractions generally. Officers may briefly, and without warrant, stop and detain a person they reasonably suspect is, or is about to be, engaged in criminal conduct. This exception to the warrant requirement is often referred to as a "Terry stop." E.g., Mendez, 137 Wash.2d at 223, 970 P.2d 722. While Terry does not authorize a search for evidence of a crime, officers are allowed to make a brief, nonintrusive search for weapons if, after a lawful Terry stop, "a reasonable safety concern exists to justify the protective frisk for weapons" so long as the search goes no further than necessary for protective purposes. Duncan, 146 Wash.2d at 172, 43 P.3d 513. This brief, nonintrusive search is often referred to as a "Terry frisk." E.g., State v. Glossbrener, 146 Wash.2d 670, 680, 49 P.3d 128 (2002). If the initial stop is not lawful or if the search exceeds its proper bounds or if the officer's professed belief that the suspect was dangerous was not objectively believable,[5] then the fruits of the search may not be admitted in court. Id. at 682, 684-85, 49 P.3d 128; State v. Kennedy, 107 Wash.2d 1, 9, 726 P.2d 445 (1986).
¶ 10 A Terry investigative stop only authorizes police officers to briefly detain a person for questioning without grounds for arrest if they reasonably suspect, based on *1269 "specific, objective facts" that the person detained is engaged in criminal activity or a traffic violation. Duncan, 146 Wash.2d at 172-74, 43 P.3d 513 (citing Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Terry investigative stop exception was first adopted under the Fourth Amendment to the United States Constitution, which forbids "unreasonable" searches and seizures, implicitly recognizing the State's police power to conduct "reasonable" ones. Terry, 392 U.S. at 20, 88 S.Ct. 1868; Johnson, supra, at 598. It was later (largely) accepted as an exception under article I, section 7 of the Washington Constitution. State v. Hobart, 94 Wash.2d 437, 441, 617 P.2d 429 (1980); State v. Lesnick, 84 Wash.2d 940, 942-43, 530 P.2d 243 (1975).
¶ 11 Article I, section 7, does not use the words "reasonable" or "unreasonable." Instead, it requires "authority of law" before the State may pry into the private affairs of individuals. CONST. art. I, § 7. Washington's adoption of the Terry investigative stop exception is grounded upon the expectation of privacy. Our constitution protects legitimate expectations of privacy, "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." Myrick, 102 Wash.2d at 511, 688 P.2d 151. Whether the Fourth Amendment or article I, section 7 of the Washington Constitution is in issue, a detaining officer must have "a reasonable, articulable suspicion, based on specific objective facts, that the person seized has committed or is about to commit a crime." Duncan, 146 Wash.2d at 172, 43 P.3d 513 (citing Terry, 392 U.S. at 21, 88 S.Ct. 1868). Under the Fourth Amendment, whether the officer had grounds for a Terry stop and search is tested against an objective standard. Johnson, supra, at 598. See also Whren v. United States, 517 U.S. 806, 813-16, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (pretextual traffic stops do not violate the Fourth Amendment). By contrast, under article I, section 7, we consider the totality of the circumstances, including the officer's subjective belief. See State v. Ladson, 138 Wash.2d 343, 358-59, 979 P.2d 833 (1999); Kennedy, 107 Wash.2d at 6, 726 P.2d 445. Our constitution does not tolerate pretextual stops. Ladson, 138 Wash.2d at 352, 979 P.2d 833.
¶ 12 Terry has also been extended to traffic infractions, "due to the law enforcement exigency created by the ready mobility of vehicles and governmental interests in ensuring safe travel, as evidenced in the broad regulation of most forms of transportation." State v. Johnson, 128 Wash.2d 431, 454, 909 P.2d 293 (1996) (footnote omitted) (citing United States v. Ross, 456 U.S. 798, 806-07, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). However, we see no reason to extend it even further to parking infractions. The reasons underlying extending Terry to traffic violations simply lose force in the parking context.
¶ 13 Both parties refer us to various statutes, which they contend shed light on whether parking near the Yakima River in an "improved access facility" without a displayed permit is a civil or a traffic infraction in the eyes of the legislature. In concluding that the offense in question here was a traffic infraction, the Court of Appeals relied upon RCW 43.12.065(2)(b), which states, "violation of a rule relating to traffic including parking, standing, stopping, and pedestrian offenses is a traffic infraction." Former RCW 43.30.310 (1987), recodified as RCW 43.12.065 (LAWS of 2003, ch. 53, § 229). We do not find a legislative labeling definitive.[6] The issue before us involves the scope of constitutional protections, not statutory interpretation.
¶ 14 This court jealously protects our constitutional rights. If and when probable cause exists to believe that a crime is being committed, the general rule is that government agents must seek a warrant, unless a carefully tailored exception applies. The investigative Terry stop is one of those exceptions. Recently, we declined to extend Terry to general civil infractions, Duncan, 146 Wash.2d at 175, 43 P.3d 513, and we refuse to extend it any further today. Like *1270 in Duncan, at the time of the seizure, the officer, at most, had "a reasonable, articulable suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a" civil infraction. Id. at 172, 43 P.3d 513 (citing Terry, 392 U.S. at 21, 88 S.Ct. 1868). That is not sufficient to support a Terry stop.[7] Neither legislative labeling nor judicial creativity can change the fact that Deputy Hayter suspected a parking infraction, not a traffic infraction. The Day vehicle was parked, backed into the bushes with its engine off. Deputy Hayter suspected that the vehicle did not have the required permit to park along the Yakima River in an "improved access facility," where vehicles are required to display a parking permit. RCW 77.32.380.[8] For constitutional purposes, we find that is a civil infraction, not a traffic infraction.

CONCLUSION
¶ 15 When officers merely suspect a civil infraction has been committed, there is no ground for a Terry stop. Duncan, 146 Wash.2d at 182, 43 P.3d 513. Since there was no ground for a Terry stop, there was no ground for a Terry frisk. We reverse the trial court's admission of the evidence seized from Days' vehicle, vacate his conviction without prejudice, and remand for further proceedings consistent with this opinion.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justices CHARLES W. JOHNSON, SUSAN OWENS, RICHARD B. SANDERS and JAMES M. JOHNSON.
ALEXANDER, C.J. (concurrence).
¶ 16 I write separately simply to indicate my agreement with Justice Bridge when she writes in her dissent that an officer of the law is fully justified in approaching an occupied parked car and engaging the occupants in conversation. She correctly observes that the officer need not possess an articulable suspicion that the occupants of the car are engaged in criminal activity in order to do so. Indeed, if in the course of this activity the officer observes items in plain view, which would justify conversion of this slight intrusion into a so-called Terry[1] stop or a full arrest, the officer may act accordingly.
¶ 17 Where I part company with Justice Bridge is in her conclusion that a Terry stop is justified whenever an officer comes upon an occupied vehicle that is illegally parked. In that regard, I fully subscribe to the majority's view that the civil infraction of parking illegally, does not, by itself, justify such an intrusion into the private affairs of the occupants of the vehicle. I, therefore, join the majority in reversing the Court of Appeals.
BRIDGE, J. (dissenting).
¶ 18 Where an officer is investigating an infraction involving an occupied motor vehicle, I see no reason to distinguish between a traffic infraction and a parking infraction for purposes of our article I, section 7 analysis. Under the plain language of RCW 77.32.380, when, as here, the parking infraction occurred in the officer's presence, the officer is justified in contacting the occupant. And too, I find a similarity between this case and State v. O'Neill, 148 Wash.2d 564, 62 P.3d 489 (2003), a case in which we explained that an officer can lawfully investigate an occupied parked car without the encounter necessarily raising the requirements of a Terry[1] *1271 stop. I would emphasize here, as we did in that case, that an officer can approach an occupied parked car and engage the occupant in conversation without the Terry articulable suspicion of criminal activity. Because the majority implies that the officer in this case was not justified in approaching the vehicle, talking with its occupants, or taking into account what was in plain view inside the vehicle compartment, I respectfully dissent.

Analysis
¶ 19 The debate in this case centers around whether the stop was justified. Pursuant to Terry, an officer may briefly stop an individual to investigate a reasonable suspicion that the person has committed or is about to commit a crime. State v. Duncan, 146 Wash.2d 166, 172, 43 P.3d 513 (2002). Absent reasonable suspicion of criminal activity, Terry stops are permitted in Washington for traffic violations but not for other civil infractions. Id. at 173-74, 43 P.3d 513. In Duncan, we explained the reasons for the different treatment of traffic infractions and other civil infractions:
Traffic violations create a unique set of circumstances that may justify this extension of Terry, but which may not be appropriate for other civil infractions. For example, this court has acknowledged the diminishment of privacy interests "due to the law enforcement exigency created by the ready mobility of vehicles and governmental interests in ensuring safe travel, as evidenced in the broad regulation of most forms of transportation."
Id. at 174, 43 P.3d 513 (emphasis added) (quoting State v. Johnson, 128 Wash.2d 431, 454, 909 P.2d 293 (1996)). Thus, an officer investigating a traffic infraction may detain the person for a reasonable period of time necessary to establish identity, check for outstanding warrants, and check the status of the person's license, insurance, and registration. Id. at 174-75, 43 P.3d 513. The detention may continue long enough for the officer to issue a notice of a traffic infraction. Id. at 175, 43 P.3d 513. In contrast, an officer can detain a person involved in a nontraffic civil infraction only when the civil infraction occurred in the officer's presence. Id. at 178, 43 P.3d 513.
¶ 20 The majority concludes that the parking infraction that justified the initial contact between the officer and the Days in this case should be treated more like the civil open container infraction in Duncan than a traffic infraction. Majority at 1269-70. But the justifications cited for extending Terry to traffic infractions exist anytime the subject of the officer's investigation is an occupied vehicle. See Duncan, 146 Wash.2d at 174, 43 P.3d 513. The exigency created by the mobility of a motor vehicle exists when the vehicle is parked if it is occupied and could be driven away. See id. In either case, the vehicle is highly mobile and capable of transporting contraband and weapons. For this reason, I would treat an investigation of a parked, but occupied, vehicle the same as an investigation of a vehicle stopped for a traffic infraction.
¶ 21 Moreover, when a civil infraction occurs in an officer's presence, the officer may detain the person long enough to check his or her identification. Id. at 174, 43 P.3d 513. Thus, even if the parking infraction in this case were classified as a civil infraction, if the parking infraction occurred in the officer's presence, then the initial stop, long enough to establish identification, was justified. Id. at 174, 178, 43 P.3d 513.
¶ 22 RCW 77.32.380 explains that the State may require that a permit be displayed on motor vehicles using an improved access facility. RCW 77.32.380(1). The statute also requires that "[t]he vehicle use permit must be displayed from the interior of the motor vehicle so that it is clearly visible from outside of the motor vehicle." RCW 77.32.380(2) (emphasis added). Failure to display a required permit is an infraction under chapter 7.84 RCW. RCW 77.32.380(3). A notice of a civil infraction may be issued by an enforcement officer when the infraction occurs in the officer's presence. RCW 7.80.050(2).
¶ 23 In this case, the officer testified that the necessary parking permit was not clearly visible when he approached the vehicle. Report of Proceeding (RP) (Mar. 22, 2004) at 17-18. Thus, the officer's initial contact with the Days was prompted by the fact that they *1272 were committing a parking infraction under RCW 77.32.380 in his presence. While he may have exercised discretion as to whether to issue a citation had the Days possessed a permit but failed to make it clearly visible, the officer was clearly justified in approaching the vehicle and asking for identification in these circumstances. RCW 77.32.380(2).
¶ 24 Finally, I would emphasize the extent to which an officer may investigate suspicious circumstances, even outside the realm of a Terry stop. The facts in O'Neill are very similar to this case. In O'Neill, the defendant was parked in the parking lot of a closed business that had been burglarized twice in the previous month. 148 Wash.2d at 570-71, 62 P.3d 489. Based on that alone, the officer shone a spotlight on the license plate and ran a computer check on the plate number. Id. at 572, 62 P.3d 489. The officer then deduced, based on fog on the car windows, that the car was occupied. Id. He approached the car, talked with the occupant, and asked for his identification. Id. When the occupant could not produce his identification and admitted that his license was suspended, the officer asked him to step out of the car and patted him down. Id. The Terry detention did not begin until the officer asked the occupant to step out of the car. Id. at 581-82, 62 P.3d 489.
¶ 25 In O'Neill, we took care to explain that an officer can investigate suspicious circumstances by approaching a car and asking questions, without the encounter reaching the level of a Terry stop. Id. at 574, 62 P.3d 489. The O'Neill court recognized that the citizens of this state "expect the police to investigate when circumstances are suspicious, [and] to interact with citizens to keep informed about what is happening in a neighborhood." Id. at 576, 62 P.3d 489. Thus, we recognized that an officer could approach a vehicle and ask the occupant for identification even without articulable suspicion that satisfies Terry. Id. at 577, 62 P.3d 489. We emphasized that where a car is parked in a public place, the occupant is "visible and accessible to anyone approaching;" "[t]he occupant of a car does not have the same expectation of privacy in a vehicle parked in a public place as he or she might have in a vehicle in a private location." Id. at 579, 62 P.3d 489. "The occupant is free, of course, to refuse an officer's request to open the window, and is under no obligation to engage in conversation with the officer." Id.
¶ 26 The O'Neill court found no constitutional violation when an officer approached a car to investigate based only on the fact that it was apparently occupied and parked in the parking lot of a closed business. Id. at 571-72, 62 P.3d 489. The O'Neill officer articulated no reasonable suspicion of criminal activity, and indeed we expressly rejected the notion that such suspicion was necessary to support the officer's approach and questions. In this case, the officer approached a car and conversed with its occupants, also in a public place, because he suspected a parking violation and because he wanted to be sure migrant workers were not living in the parking area. RP (Mar. 22, 2004) at 18. Like the O'Neill court, we should discern no constitutional problem with this contact. 148 Wash.2d at 579, 62 P.3d 489. Moreover, everything the officer saw during his approach and conversation with the occupants, including the occupant's movement within the car and the open but empty gun case, was in plain view. RP (Mar. 22, 2004) at 18-19.
¶ 27 In sum, I would conclude, based on this court's analysis in Duncan and O'Neill, that there was no Fourth Amendment or article I, section 7 violation in this case. I, therefore, respectfully dissent.
WE CONCUR: Justices BARBARA A. MADSEN and MARY E. FAIRHURST.
NOTES
[1] The deputy's interest in whether Day had a permit was first raised at the suppression hearing. No suspicion of a missing parking permit is noted in the original police report Deputy Hayter filed. While the permit may have been an afterthought, Charlie Day has made no pretext arguments before this court, and thus we do not consider whether this search should have been suppressed under State v. Ladson, 138 Wash.2d 343, 979 P.2d 833 (1999).
[2] For ease, we refer to the defendant Charlie Day as "Day" and his wife by her full name.
[3] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[4] As Justice Brandeis put it:

The door of a court is not barred because the plaintiff has committed a crime. The confirmed criminal is as much entitled to redress as his most virtuous fellow citizen; no record of crime, however long, makes one an outlaw. The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction. It is sometimes spoken of as a rule of substantive law. But it extends to matters of procedure as well. A defense may be waived. It is waived when not pleaded. But the objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself.
Olmstead v. United States, 277 U.S. 438, 484-85, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (footnotes omitted).
[5] The State does not argue that, outside of the relatively relaxed standards of a Terry search, Deputy Hayter had objectively reasonable fear for his safety that justified the search. Accordingly, we do not reach whether, given the acknowledged gun, the likely parking infraction, the rubber gloves, the cigarette lighters, and the furtative movement would support a search on that basis. We think it highly unlikely, however, that the lawful possession of a gun could be the basis for a lawful search without burdening rights under article I, section 24 of our constitution.
[6] Although the legislature may declare an offense a "traffic offense" for certain purposes, such labeling is not binding for constitutional purposes.
[7] We agree with our colleagues that an officer may approach and speak with the occupants of a parked car even when the observed facts do not reach the Terry stop threshold. Concurrence at 1270; dissent at 1272; cf. State v. O'Neill, 148 Wash.2d 564, 577, 62 P.3d 489 (2003). We stress that the issue before the court is whether we should expand the Terry exception to the warrant requirement to include parking infractions, not whether Deputy Hayter acted improperly by approaching the Days' car.
[8] The incident was recorded by a camera mounted in Deputy Hayter's patrol car. The Day vehicle was parked so that the back of the vehicle was in the shrubbery. The record reflects that the improved access facility permits are usually affixed to the back of the vehicle. The videotape fails to show that Deputy Hayter ever attempted to look at the back of the vehicle to see if it was properly permitted.
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).